We'll turn to the third case of the day, United States v. Constancio Palomino-Chavez, Appeal No. 18-1001, and we will hear first from Ms. Bedard. Thank you, Judge Hamilton, and may it please the Court. Hannah Bedard of Kirkland & Ellis on behalf of Appellant Mr. Constancio Palomino-Chavez. This appeal involves the warrantless and unlawful search of Chavez's curtilage, resulting in the evidence that should have been suppressed. The District Court should have granted Chavez's motion to suppress for three separate reasons, any one of which is sufficient for this Court to reverse the District Court. First, under the Supreme Court's recent decision in Collins v. Virginia, the officers illegally entered Chavez's curtilage for the purpose of conducting a search. Second, the officers created an inherently coercive environment making it so that Chavez could not refuse consent. Third, the officers exceeded the scope of any consent by searching the standalone shed. Ms. Bedard, let's go to that first point with regard to the the curtilage. In Collins, as I understand it, the description of the end of the driveway, in that case where the motorcycle was, is enclosed on two sides by a brick wall, about the height of a car, and on the third side by a house. Here we've got a driveway which extends past the front door, past the back door, to at some juncture being next to the backyard, correct? That's right. The second part of your first point was that the officers went to that location to do a search. What portions of the record are you relying on for purposes of what the officers were doing when they got to the end of the driveway? So in this case, the officers decided instead of knocking at the front door, which is what Jardine said in the Supreme Court is allowed, the officers instead decided to walk straight down the driveway. They said, Officer Weary testified at Appendix 86, there was a front door and side door off the sideway. So we just checked. Those were both closed, so we went right past them. Officer Guzman testified at Appendix 124. When asked originally, did you go to the front door? He said no. When asked, where did you go initially? He said up the driveway. In this case, the officers were clearly conducting a search. One of the other officers also testified that he was shocked to see Mr. Palomino Chavez in the backyard hammock. Precisely. Officer Weary testified that they were, quote, just as shocked or that Mr. Chavez was, quote, just as shocked to see him as he was them. And Officer Weary further characterized what the officers were doing as a, quote, cursory search. And that's at Appendix 85. This is not the testimony of officers who are simply looking to conduct a knock and talk. This is the testimony of officers who trespassed into the curtilage to see what they could find. It's the case, Ms. Bedard, that the officers observed the van back into the garage and from the street, correct? The officers that were on surveillance did witness that. None of the three officers that testified at the hearing had eyes on the house. So they were relying on the reports that were coming over the radio. And the officers testified that there was, quote, nothing specific that came over the radio. So the government's contention in its brief that they knew that Mr. Chavez would be in the backyard when they entered directly there is unsupported by the record. What would happen if they knocked on the door? If they were perfectly okay under the Supreme Court's decision in Jardines because the Supreme Court says you can knock to the front door, there's an implicit license to do that because that's no more than a delivery person or a Girl Scout would do. What would they do after knocking on the door with no answer? If there was no answer, then the officers would have exceeded their implied license. They can leave and they can get a warrant, but they cannot venture into the backyard. What the officers did here was really no different than if the front door had been open, they had received no answer and they walked right into the house and started looking around. There's a bright line rule in Jardines that you cannot pass the front path, but that's exactly what the officers did here. So they entered the part of the driveway that's private and protected by the Fourth Amendment and they started looking around. And that's when, as Judge Hamilton pointed out, the officers were shocked to see Chavez in the backyard. Ms. Bedard, could you just describe for us what the evidence shows about walls or fences in the back, the side and behind the house here? So the evidence shows that there was a wall separating the neighbor's driveway from Chavez's driveway, and you can see that in the photograph. That's the low wall there? The low wall, which is to the left in that photograph that you're a tree in the backyard. We know that there was the garage in the shed that were ostensibly separating his yard from the yard behind his, but we don't know about any divisions on the right side. Suppose on this issue of the curtilage intrusion that we just assume for purposes of argument that Jardines does not answer the question here definitively, but Collins does. Under those circumstances, the government is relying on Davis good faith reliance, and in particular on the Evans, French, and Blevins cases. I guess it would be helpful to me if you would address both how specific precedent has to be under Davis in general and how that rule applies to Evans, French, and Blevins. So for the exception of Davis to apply, the Supreme Court in Davis, and this court in cases like Gary and Whitaker, says that that exception only applies when binding circuit precedent specifically authorizes a particular police practice. At the time of this search, there was no circuit precedent that specifically authorized trespassing onto the driveway without a warrant for the purpose of an investigation, and none of those cases such as Evans, French, or Blevins say otherwise. Blevins talks about what what is generally the case, correct? So Evans does say, I'm sorry, Blevins does say that generally there's no expectation of privacy in a driveway. This court said that in dicta when deciding whether a south field was entitled to an expectation of privacy, and this court's decision in United States versus stated that at the time of the search, there was no recognized expectation of privacy in the common areas of a multi-unit apartment building. That case was deciding whether Kylo gave the officers the good faith exception or not when Jardines was decided after the search occurred. And here this court said, the logic of Kylo should have reasonably indicated by the time of the search that a warrantless dog sniff would ordinarily amount to an unreasonable search in violation of the Fourth Amendment. The same logic applies here. Even if Jardines does not directly control the officer's behavior, which we believe it does, Jardines' decision should have reasonably indicated to the officers that they could not go past the front path. And Evans, Blevins, and French are really only dealing with whether there's a reasonable expectation of privacy in a driveway. They're not dealing with the trespass theory that we're asking this court to apply here. And I see that I am... I'm going to give you, there's enough going on here, I'm going to give each side at least three extra minutes. Okay, thank you. And so it would be helpful. I'd like to hear your thoughts on the issue of consent, but I also want to get some sense of the role of the frisk here, because I understood your argument to be that this intrusion was actually considerably more intrusive than a Terry stop would be on a public way, since we've got officers coming into a backyard, private space, surprise the resident who's there, and then frisk him. Precisely. And in the district court's decision, the district court erroneously said the officers made no show of force, and that's just incorrect under the record. Officer Guzman testified that as soon as he approached the defendant, he conducted a pat-down without asking any permission, and he confiscated his cell phones, which, because Mr. Chavez was alone on his property, were really the only way that he could have communicated with another person. And the district court, in addition to disregarding the pat-down, the district court began its voluntariness analysis without recognizing that the officers were standing on Chavez's curtilage. And consent, as your honor pointed out, consent is viewed differently if it's given in a public park than it is if it's given in a person's own living room. I want to follow up on that consent issue, the scope of the consent. When Inspector Guzman is testifying at the suppression hearing, he's talking about this distinction between the word property, written in English, on the Spanish side of the form, and he indicates that he used the Spanish version of the word property. He admits that he does not list the shed, although he lists house, vehicle, and garage. But then apparently he does some sweeping arm movement when he's testifying, and he confirms that that's what he did in front of Mr. Palomino. Does that affect how Mr. Palomino would have viewed the scope of the search? We don't believe that the arm motion itself affects the view that Mr. Palomino Chavez would have had. When Officer Guzman himself was testifying, and he talks about this general arm movement that he made, he testifies that he made the arm movement to the residence, to the garage, and vehicle. Not once in his testimony does he even attempt to say that he either pointed to, verbally announced, or in writing announced that they plan to search the shed. This is an area where there are four structures. The officers knew of all four because they conducted a protective sweep of all four, but when it came time to ask for Mr. Chavez's consent to search, they named three of those structures. There weren't tens of structures on the property. There were four, and they named three of them. So any reasonable person in that case would have understood they only wanted to search the three that were specifically named. This court in Lemons stated that a general consent form does not make a search any broader if there's an explicit explanation of what the search is going to encompass. In this case, Officer Guzman explicitly told Mr. Palomino Chavez that he was going to search three areas, and his writing the general word property on the written consent form does not say what the officers did here.  The defendant had to review the consent form in Spanish, and is it correct that that form said that he could refuse? It is correct that the form said he could refuse. Officer Casper testified that the conversation about the consent form was, quote, possibly a minute, and Officer Guzman testified that Mr. Chavez reviewed the form for, quote, a couple seconds before signing it. And again, in this case, because of the pat-down, because the officers were standing around on his property, because they had already conducted a protective sweep, Mr. Chavez felt at that point that objecting to the search, despite the written consent form telling him that he could, would have been fruitless. And Mr. Chavez did not testify at the suppression hearing, did he? He did not testify, although the officer's testimony here actually supports Mr. Chavez's case. I'm going to save the rest of your time for rebuttal. Thank you very much. Thank you. We'll next hear from Ms. Bonamici for the government. May I please the Court? Counsel, good morning. Deborah Bonamici on behalf of the United States. Your Honor, under Collins, the case was different in some very important respects. The area where the officers went to in this case was different in very important respects from the area where the motorcycle was located in Collins. And Judge Brennan, you've already alluded to one of those differences, a very important difference, which was that the motorcycle was surrounded in an enclosure of two sides, or three sides, the house being one of the sides. And that enclosure was directly outside the side entrance to the house. So it was clearly attached in a material way to the house. And that is a very distinct difference here. In this case, there were no gates, no fences, and the wall that we've been talking about... Didn't Collins tell us though, in terms of visibility and fences, that's not conclusive? That's correct. What Collins says is that those things are not conclusive, not that they're not. The wall that we've been talking about on the side of the driveway that actually separates the two driveways is actually a retaining wall. The officers testified that the house next to the house in question here was about two and a half feet elevated. The property was elevated from the property upon which 4505 Newburgh sat. And so the retaining wall was basically like a... I'm not saying it was a bench, I'm just saying it was, in fact, used by the defendant as a bench. And that was about the height. So it wasn't something that enclosed or created privacy, it was something that prevented... So you wanna distinguish Collins based on how high the wall is? No, I wanna distinguish Collins on the basis that there is no enclosure surrounding the area where the police went. There is a straight... Why did the police pass the front door and the side door? They testified that they noticed that the front door was closed. First of all, what had happened before had happened in the rear by the garage, what they had been observing. Other officers. Pardon me? Other officers. Well, other officers reporting by radio. Right. Okay. So what had happened... The incident had occurred, or what they had observed, had occurred in the back. The front door appeared to be shut. They had seen no entry or exit from the house between the time of the events that they were investigating and the time that they entered. The side door, which is approached by the way, the front door is approached by the driveway. Both the front door and the side door are approached by the driveway. What happens is you go off the driveway and then you either can turn off on some little steps that make a small front porch under the front door, or there's also a little step that hangs out into the driveway on the side to the side door. But they're all basically on the same path. And so they saw the side door was also closed and they were concerned that people, whether it was a defendant or not, they were concerned that there may be people outside in those areas. They testified that they wanted to approach the house in safety. How is that consistent with the officer's testimony that they were Mr. Chavez, and he was as shocked as they were to see him? As I understand that testimony, they were shocked to see him sitting in a hammock in the backyard. They weren't... I don't know that they were surprised to find somebody in the back, other than that as they approached, they saw nothing, no one, and then they see him to the side. And what happens then is that they announce their office and they motion him or beckon him over and he comes immediately. And your theory is that that was entirely voluntary on his part, when three armed police officers intrude into his backyard and announce themselves. Well, yes, I think it was voluntary. Would they have been entitled to walk over onto the grass to talk to him at the hammock? I think that's unclear and perhaps not. And I think the fact that they understood that and believed that they were acting properly is demonstrated by the fact that throughout their testimony, they continually emphasized that they stayed on the driveway. So I think it's pretty obvious that there... I assume they were well prepared, but what purpose did they have for being there, other than a search of the curtilage and other buildings out there? Their purpose was to confront the defendant. That was their purpose for going there. They were going to confront the defendant, talk to the defendant, basically do... Did they say that in their testimony? They said that, yes, they were... They said that they were going to... I'm trying to think of what line I'm relying on. Their intention was to go and speak with the defendant. I do believe they said that. I'm having trouble, then, with the notion that they were surprised to see him. If there's a difference between being surprised to see him in a hammock, as they just passed the perimeter of the house... They apparently walked to the back of the house, and just beyond that, you could see the defendant in a hammock. Just with your eyes, you could see it if you're standing at the corner of the house. I think there's a difference between being surprised and shocked to see him there, where everything is quiet as they walk up, than being completely shocked to see that the defendant is anywhere in the area. I don't think that that was what they were intending to convey. Let me take you to page 21 of your lay down. You write, when the officers saw defendant last, he had exited the garage towards the backyard. Those officers there, would those be the surveillance officers different than the officers who went down the driveway? I believe that... I believe that that's probably inartfully drawn in the sense that the officers testified that they were not the ones who were observing, but their collective knowledge, based on the radio reports, were that that's where he was last seen. And then you go on, it was reasonable, based on these earlier observations, for the officers to approach the back of the house where they last had seen defendant, rather than ring the front doorbell. Yes. And by that, and I think that's true, and I think that the idea here is that the activity that had been observed all happened in the back. The van had pulled up, backed up into the garage, and the defendant was seen in that area while the van was there. The van had pulled away, and they went, they were looking at the back. Now, to be clear, the officers testified that one of their primary concerns was that there would be multiple people, it was officer safety, that there would be multiple people in that general area that would potentially endanger officers... Where they are intruding. So I understand concern about safety, but they're intruding. And one of the most astonishing facts about this case is the frisk. I mean, you've got a man lying in a hammock in his backyard. Police don't have a warrant. They're not in hot pursuit. There aren't exigent circumstances, and they walk into this private area in back of the house. They order a civilian to come over to them, then frisk him. And this sounds to me like the kinds of tactics that General Gage and the British garrison in Boston were using, rather than post Fourth Amendment police behavior. I hear what you're saying. May I... Please. Challenge a couple of the points you made along the way. First of all, the officers were not under Collins in a private area. Understand that... That's a stretch. Okay. But it's a stretch that's supported by this court's precedent. I would say Blevins in particular, saying that there's generally no expectation of privacy. I don't know how Blevins survives Jardine, let alone Collins, on that particular victim. Well, from the officer's perspective, Jardine's involves a dog sniff on a front porch. That's a pretty different situation than a knock and talk, let's say, that goes to a back door, or follows... Walks into a driveway, or where the police proceed into the driveway. We recognize that Collins raises issues now about how much of a driveway is safe, and how much... How far they can encroach. It's clear that Collins does not say, you may not step foot on a driveway. They could have said that, and the court did not say that. Put Collins and Jardine together, though, it's pretty hard to see why you go past the front door in this case. I would say, Judge, that actually all of these cases are limited by their facts. And the reality of property, and houses, and driveways, is that there are really many, many, many different configurations. There can be multiple doors to a residence that are obvious and apparent from the sidewalk. There can be just an innumerable number of variations here. And I don't think that the fact that Jardine said you can't conduct a dog sniff on a front porch... Says you can't go into the curtilage to search. It's broader than that. Well, that's right. But the facts in that case were that the officers took a dog to conduct a dog sniff on the front porch. And the two factors here that they considered were not only the location, whether it was a constitutionally protected location, or whether it constituted curtilage, and also the officer's purposes for being there. And I think that here, there's no dog sniff. There's no evidence. The evidence does not support the notion that the officers were flooding the backyard in order to turn it over and look for everything they could. But it's obvious from their conduct that what they were intending to do was to meet with the defendant. And plainly, every officer is going to seek consent. I mean, we're not saying that that wasn't part of it. But that's a very different thing than saying that they just marched into the backyard and started ripping everything apart. They didn't start ripping everything apart. That's not until they got the consent, right? I got to believe that Mr. Chavez was a little surprised that the scope, that when he consented, it meant they could tear up the floorboards and the shed. But that's not really debated here. And on that topic, may I just comment about the sweeping motion with a hand? I mean, that shed is right next to the garage. There's no real way that he could sweep. We could show the defendant what he meant by property by making the sweeping motion that included the garage without including the shed. Let me ask you, Ms. Bonamici, how you think we can decide this case without giving the police free reign to roam into private backyards to search for evidence? Your Honor, I would say that the narrowest course to take would be to say that Collins really made a material difference to this court's precedent with respect to driveways and areas, you know, basically driveways, we'll say driveways. And that the officers in this case acted in good faith in reliance on this court's precedent, which had said, as we've acknowledged, that generally there's no expectation of privacy in a driveway and had permitted officers to conduct searches and to approach houses beyond the front door, if that's what we're going to say, and really up to and including the garage. I mean, there are cases that permit that. And I think that that would be the narrowest way to decide this case. That way, it's not necessary to determine here whether this particular configuration of a driveway or the way that this driveway was configured was like or unlike Collins. It just acknowledges that the police officers in this case had a good faith basis for believing that they could remain on the driveway. They did remain on the driveway. And I think that's the narrowest way that this court could decide it. What did the officers already know when they went up the driveway? They knew they had reasonable or probable cause to believe that a drug transaction had occurred in the driveway or that drugs were dropped off or that... Sorry, probable cause? No, that's wrong. Reasonable suspicion. You haven't even argued reasonable suspicion in this case. This is just surveillance, right? That's true. I want to follow here. What did they already know from the previous officers who were surveying? Well, in particular, they knew that this van had left Midway Airport, an area right near Midway Airport. They had the van under surveillance as part of their narcotics investigation. The van traveled all the way to Rockford and went to this house, backed up into the driveway, not only backed up through the driveway, into the garage, but was too big to fit into the garage. And so it stopped and the doors closed, partly, and remained there for a short time, and then the van drove away. The van then was stopped by other officers, and radio reports were coming in. Was that before the officers went up the driveway, the stopped van? Or that they would know... What you just explained, though, they did know that the truck had backed in there, closed the garage door on top of the hood or whatever happened, and did something, and then the van left. I should know that, but I don't. I can't. I don't remember precisely what the testimony was on that. I thought that one of the things that the district judge thought was the credibility of the officers, what they were describing, and how they approached and understood. And I thought that was what they knew. They knew that van came, did something weird, and then left. I believe that. I mean, that is what I believe, too, but your question, I thought, was even more specific than that, which was, was this before the officers set foot in the driveway? Was it before they got out of their cars and approached? Yeah. And I think that's right, but I'm not sure that I can remember the detail there, so I don't want to... Well, I thought there was some space and time between when the van left and when they showed up. There is some space and time between when the van left and they showed up. The question is, was there some space and time between the radio report after the stop of the van or was that information coming in as they were deciding what they were going to do or going up the driveway? Well, I would just look at it just from the standpoint of there's a suspicious van for whatever reason, and they followed it and all that, and then the van went in there and put the hood down, couldn't see everything going on, and then the van left. That's all I'm saying, with the officers. They knew that. Yes. Okay, well, that's probably one reason they walked up the driveway. Right, right. I mean, they walked up the driveway in order to accomplish what they actually did when they got there, right? They walked up there, they intended to confront or meet or talk to. The defendant was their goal. They attempted to do that in a manner that was safer for the officers in the sense that there might have been other people back there, although no one had been seen. The door to the front and the door to the side were closed, and no one had come in or out, so they had no reason to believe that they would be in the front. Has the Supreme Court, Ms. Bonamici, has the Supreme Court extended the sort of knock and talk notion to include frisks as a matter of routine? I would not say that they have said that it is perfectly fine to conduct a frisk as a matter of routine. I do think that in the context of an interchange with somebody who is believed to be in the drug business, that officers will and should protect themselves by doing a protective sweep. Recall that they did not do an actual sweep of the property. I didn't ask you about the protective sweep. I asked you about the frisk. Right. I think, I mean, that is what, I do not believe that the Supreme Court has ruled on that topic. It is difficult for me to see that action as at all consistent with the whole notion of voluntary encounters with knock and talk, whether it is in an airport where the person is free to walk away or in his own backyard or at the front door. At some point, Ms. Bonamici, does the suppression hearing testimony talk about officers seeing the defendant exiting the garage toward the back door of the house? Yes. Again, this goes to the surveilling officers from the street, or is this the officers that end up walking down the driveway? My understanding, and my understanding is that that was what was seen by officers who had eyes on the house. It was conveyed by radio. So there was collective knowledge of the officers of all of those facts, is my understanding. So the officers, when they're walking down the driveway, they're aware that there may be a person in the house or that property. They also know that the individual who would have driven the van from Midway area to Rockford has now left, is that correct? That's correct. That's correct. So they would have known that someone may have entered a back entrance to the house, or that someone might be in the backyard. I don't know that they actually expected someone to be in the actual yard. Any other points you'd like to make? Your Honor, as to the – I think that's covered. If this Court has no further questions, we would ask that you affirm the district court's decision in this case if only appropriately based on the officers' good faith in this case, because they acted with good faith in the belief that what they were doing was correct, and that belief was reasonably based on this Court's precedent. Thank you, Ms. Bonamici. Ms. Bedard, take several minutes, say three minutes for now, for rebuttal, please. Thank you, Your Honor. First, to the government's point that the officers were simply surprised to see Chavez in a hammock, the testimony from Officer Weary says, quote, I was shocked for a second to see him, and I had my badge ready, so I just kind of showed it to him and yelled police, and he kind of made the same movement. He was just as shocked to see me as I was him. Officer Weary does not testify that he was simply shocked to see Mr. Chavez laying in a hammock. He was shocked to see him, period. And the officers, again, to the government's point, that there was this side door. The side door here is irrelevant. The officers could not see Mr. Chavez when they got to the side door.  Officer Weary testified that they got all the way down, quote, to the corner of the house where I could see the backyard area, and that's when he made visual contact with the defendant. It's not that they were standing at the side door when he was able to see him. Second, the government attempts to distinguish Collins by suggesting that this enclosure part is relevant, and the enclosure is not relevant to the decision here. The government and the district court both suggested that Mr. Chavez's driveway was not entitled to Fourth Amendment protections because it was visible to the street, and any person could walk down that area. But as the court in Collins said, quote, the ability to observe inside curtilage from a lawful vantage point  for the purpose of conducting a search, and that's exactly what the officers did here. They walked into the curtilage, passed the bright-line rule set forth by Jardines. The government's contention that the Fourth Amendment is, quote, limited by the facts is just completely wrong in the face of this court's precedent and the Supreme Court's precedent. The Fourth Amendment is all about bright-line rules. Officers need to know where they can and cannot go. Jardines here set forth the rule that the officers should have followed. They did not follow that rule here. Ms. Bedard, with regard to consent, where Mr. Palamino-Chavez ends up against the retaining wall during the course of the search, not the protective sweep, the search later on, does record indicate how much of the backyard he's able to see? So Officer Weary was standing with Mr. Chavez while the search was happening at the concrete wall. Officer Weary testified that he was able to see the garage and the residence, but that his view was blocked because of one of the buildings. And so it's not clear from the testimony whether Officer Weary and thereby  goes against the district court's point and the government's point that just because Mr. Chavez did not object to the search, because they believe he was able to see the shed, that's not supported in the record. I don't suppose it would really do to say in the midst of the search, oh, but you can't go in the shed. Or don't look under the floorboards. And exactly to your point that the officers came on to his cartilage. They conducted a pat-down physically of his body without asking permission. At that point, no reasonable person is going to say, excuse me, please stop searching my shed. At that point, his consent was already involuntary. The officers were already at an unlawful vantage point. No person would have refused consent or attempted to stop the officers at that point. And here, again, to the government's point that if there was perhaps reasonable suspicion or probable cause, that may somehow justify what the officers did here, that goes completely against the Supreme Court's precedent in Agnello, where the court said, quote, an officer's belief, however well-founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. The officers here attempted to get around that rule by walking down the driveway, past the back of the house, and conducting what they called a cursory search of the area before meeting Mr. Chavez in his backyard, before frisking him, as Your Honor pointed out, and only then asking for his consent to search several of the structures on the property. And finally, as Your Honor said, a frisk on someone's property is not consistent with a knock and talk. And the officers here violated Mr. Chavez's Fourth Amendment rights by entering the curtilage, by coercing him into giving them his consent, and by expanding the scope of any consent that he gave to search the floorboards and find the evidence that here should have been suppressed. If Your Honors have no further questions, we respectfully request that the decision of the district court be reversed. Thank you, Ms. Bedard. Thank you to both counsel for the very helpful presentations. Ms. Bedard, you and your law firm were recruited by the court to help assist your client in this case and the court, which you've done ably. Thank you very much. And, of course, thanks to the government for its customary and excellent presentation. We'll move on to the next case.